**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Dorazio, | No. CV-23-00017-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Allstate Fire and Casualty Insurance Company, | |
| Defendant. | |

Plaintiff Brian Dorazio had an auto insurance policy with defendant Allstate Fire and Casualty Insurance Company. The policy covered four vehicles and purported to have a per-person limit of $100,000. In 2021, Dorazio's daughter was seriously injured in an accident with an uninsured non-party in which she suffered more than $100,000 in damages. Allstate refused to pay more than $100,000 and Dorazio filed this suit. Dorazio seeks to certify a class of Allstate policyholders who had multiple insured vehicles, suffered damages in excess of the policy limit claimed by Allstate, but were paid only the per-person policy limit. (Doc. 60.) Allstate's primary argument against class certification is that common questions do not predominate over individual ones. That is incorrect. Common questions are at the heart of this case and class certification is appropriate.

## I.    Background

This suit is one of many filed in recent years against insurance companies doing business in Arizona based on their handling of claims for uninsured motorist ("UI") and underinsured motorist ("UIM") coverage. The suits have revolved around what Arizona

law requires if an insurer wishes to prevent an insured from "stacking" UI/UIM coverages. "Stacking" is "when an insured obtains coverages for several vehicles and then attempts to claim multiple [UI/UIM] coverages for the same accident."[1] *Am. Fam. Mut. Ins. Co. v. Sharp*, 277 P.3d 192, 196 (Ariz. 2012). For example, an insured might obtain a policy covering two vehicles that provides $50,000 of UI/UIM coverage "per person." An insured wishing to stack coverages would claim the presence of a second vehicle provides "a separate, additional [UI/UIM] coverage" that can be combined, increasing the total coverages available from $50,000 to $100,00. *Franklin v. CSAA Gen. Ins. Co.*, 532 P.3d 1145, 1147 (Ariz. 2023).

Dorazio believes he was entitled to stack UI/UIM coverages in light of developments in Arizona law addressing stacking and Allstate's practices addressed below.

## A. Legal Developments

Arizona's Uninsured/Underinsured Motorist Act ("UMA") "mandates that an insurer offer [UI/UIM] coverage for every automobile liability policy issued to an Arizona insured." *Jackson v. Nationwide Mut. Ins. Co.*, 265 P.3d 379, 382 (Ariz. Ct. App. 2011). The UMA—found at A.R.S. § 20-259.01—requires insurers offer UI/UIM "in limits not less than the liability limits for bodily injury or death contained within the policy." A.R.S. § 20-259.01(A), (B). For present purposes, the crucial portion of the UMA is subsection (H).

"Subsection (H) is the only UMA provision that authorizes any limitation of UM or UIM coverage," including any limitation on stacking. *Sharp*, 277 P.3d at 196. "[I]nsurers seeking to prevent insureds from stacking [UI/UIM] coverages under a single, multi-vehicle policy must employ subsection (H)'s sole prescribed method for limiting stacking." *Franklin*, 532 P.3d at 1147. Subsection (H) provides in relevant part:

> If multiple policies or coverages purchased by one insured on
> different vehicles apply to an accident or claim, the insurer may

---

[1] This case involves both intra-policy and inter-policy stacking. (Doc. 1-3 at 19.) Intra-policy stacking is "where multiple [UI/UIM] coverages under a single policy are stacked," as when a single policy covers multiple vehicles. *Franklin v. CSAA Gen. Ins. Co.*, 532 P.3d 1145, 1147 (Ariz. 2023). Inter-policy stacking is "where [UI/UIM] coverages of multiple policies on different vehicles are stacked." *Id.*

limit the coverage so that only one policy or coverage, selected by the insured, shall be applicable to any one accident. If the policy does not contain a statement that informs the insured of the insured's right to select one policy or coverage as required by this subsection, within thirty days after the insurer receives notice of an accident, the insurer shall notify the insured in writing of the insured's right to select one policy or coverage.

A.R.S. § 20-259.01(H). This language means an insurer can prohibit stacking only if it has satisfied two requirements. First, the insurer must "expressly and plainly limit stacking in the policy." *Franklin*, 532 P.3d at 1148. Second, the insurer must "inform[] the insured of their 'right to select one policy or coverage' either in the policy itself or in writing to the insured within thirty days after the insurer is notified of the accident." *Id.* If an insurer does not satisfy both requirements, the insurer cannot limit stacking. *Id.*

### B. Allstate's Practices

Since at least 2016, Allstate has used the same policy language for all relevant policies issued in Arizona. (Doc. 60-4 at 41.) Those policies have included a "declarations page" listing the UI/UIM limits that apply to "each person" and "each accident." (Doc. 60-5 at 8.) For example, Dorazio's declarations page listed limits of $100,000 for "each person" and $300,000 for "each accident." (Doc. 60-5 at 8.) Every Arizona policy also had a section explaining the terms applicable to UI/UIM coverage. (Doc. 60-4 at 41; Doc. 60-5 at 8, 35.)

The policies' UI/UIM section stated the "each person" UI/UIM limit shown on the declarations page was "the maximum [Allstate would] pay for damages arising out of bodily injury to one person in any one motor vehicle accident." (Doc. 60-5 at 36.) The section also stated the "each accident" UI/UIM limit was "the maximum [Allstate would] pay for damages arising out of all bodily injury in any one motor vehicle accident." (Doc. 60-5 at 36.) The policy explained those limits would apply "regardless of the number of . . . vehicles or persons shown on the [declarations page]." (Doc. 60-5 at 36.) The policy attempted to reject the possibility of stacking through the following language, in all capital letters: "This means that no stacking or aggregation of uninsured motorists insurance whatsoever will be allowed by this policy." (Doc. 60-5 at 36.) According to Allstate's Rule

30(b)(6) witness, this was the only policy language that disallowed stacking. (Doc. 60-4 at 42.)

Except for a change in 2021 explained below, Allstate's claims handling practices have been the same from approximately 2019 to the present, the times relevant to this suit. Allstate admits that upon receiving a UI/UIM claim, it had an obligation to "disclose the available policy limits" and "not conceal benefits and coverages that are pertinent to the claim." (Doc. 60-4 at 22.) Allstate instructed its claims adjusters that its policy language and practices meant "no stacking." (Doc. 60-7 at 33.) Claims adjusters therefore would not disclose to an insured "that a stacked UM/UIM limit" might apply. (Doc. 60-4 at 25; 60-6 at 21.) This approach meant claims files were not fully developed because Allstate would stop investigating a claim once it was clear the non-stacked limits would be owed. That is, once Allstate had medical bills that were "worth more than the [non-stacked] policy limits," it did not investigate further but simply "tendered [its non-stacked] limits." (Doc. 60-4 at 27.)

In general, Allstate's "goal" when handling claims was "to pay what we owe." (Doc. 60-4 at 21; Doc. 60-7 at 18.) One adjuster agreed Allstate's "philosophy" was to not "pay more than we owe." (Doc. 60-6 at 27.) Despite this "goal" or "philosophy"—and Allstate's alleged belief that it did not "have a stackable policy"—Allstate sometimes paid claims for stacked benefits. (Doc. 60-4 at 59). From 2019 to 2024, Allstate paid stacked UI/UIM benefits at least "15 to 25 times." (Doc. 60-4 at 57.) Allstate's 30(b)(6) witness explained the internal evaluation process that led Allstate to pay stacked benefits: "[w]henever we receive a challenge of any kind, whether stacking or any other coverage argument, what Allstate does is . . . it will circle in the leader and refer to our claims litigation department." (Doc. 60-4 at 58.) Allstate would look "at the potential value of the claim, the potential cost to defend the claim and . . . the venue that [it would] be entering into." (Doc. 60-4 at 58.) This evaluation, according to Allstate, led it to sometimes pay stacked limits after conducting fact-specific inquiries into the underlying claim.

To the extent Allstate conducted a fact-specific inquiry, Dorazio provides evidence

showing the sole determinative fact was whether a lawyer for the insured demanded payment of stacked benefits. Every time a lawyer made a demand for stacked benefits, Allstate concluded the "most appropriate" result "for the company and the customer" was to pay the stacked benefits. (Doc. 60-4 at 59.) In effect, Allstate would not "offer[] stacking unless it was specifically requested," but if requested by a lawyer, stacked benefits were paid. (Doc. 81-4 at 31, 36.) Allstate maintains stacked benefits were never mandatory and it paid such benefits solely as a matter of its discretion. (Doc. 60-4 at 59.) Allstate's 30(b)(6) witness, however, could not identify any other insurance benefits that were "precluded by the policy" but that "Allstate regularly pays." (Doc. 60-4 at 60.)

One aspect of Allstate's claims handling practices changed in 2021. Before 2021, when Allstate learned of a UI/UIM claim, it did not send the insured notice regarding the right to select one policy or coverage. In 2021, because of "challenges from claimants and their attorneys," Allstate allegedly began "sending a letter notifying the insured of the right to select one policy or coverage." (Doc. 60-4 at 51–52) Those letters were an attempt to comply with the notice requirements of subsection (H) to prevent stacking. (Doc. 60-4 at 53.)

### C. Dorazio's Claim for Stacked Benefits

Dorazio is the father of A.D. (Doc. 60 at 12.) In 2021, A.D. was seven years old and seriously injured in a car accident where an uninsured non-party was at fault. (Doc. 1-3 at 7.) Dorazio had a policy with Allstate covering four vehicles with "per person" UI/UIM limits of $100,000. (Doc. 60-5 at 6.) Through counsel, Dorazio made a claim on behalf of A.D. for "the immediate tender of all applicable uninsured motorist policy limits." (Doc. 60-8 at 3.) Allstate conducted a limited investigation and internally valued A.D.'s claim at $212,475. (Doc. 60-4 at 27.) Despite knowing the claim exceeded the single coverage limit and that stacking was sometimes offered, Allstate did not disclose that stacked coverages were possible. It instead paid only the single coverage limit of $100,000. (Doc. 60-4 at 27; Doc. 60-7 at 23.)

In 2023, Dorazio filed this putative class action. (Doc. 1-3 at 12–13.) Dorazio

alleged Allstate's refusal to disclose and pay stacked UI/UIM coverages when damages exceeded the per-person limit constituted a breach of contract and breach of the covenant of good faith and fair dealing. Dorazio also asserted a claim for declaratory relief, seeking "a declaration that stacking is permitting [sic] on Allstate policies." (Doc. 21 at 4.) Allstate removed the case to federal court and the parties engaged in discovery. (Doc. 1.)

### D. Proposed Class

Dorazio seeks to certify the following class of Allstate insureds:

> All insured persons under one or more [Allstate policies] issued in Arizona to the same purchaser covering multiple vehicles at the time of a covered loss who, from the earliest allowable time to the date judgment enters, received UM/UIM benefits in an amount equal to the limits of only one of the UM/UIM coverages under the applicable policy or policies.

(Doc. 60 at 13–14.) In more straightforward language, the class would include those persons who had an Allstate policy or policies covering more than one vehicle, were injured in a covered accident, and were paid the UM/UIM coverage limit as if there were only one insured vehicle. Allstate opposes class certification primarily arguing common issues do not predominate over individual issues.

## II.    Documents Considered

In opposing the motion for class certification Allstate relied on the testimony of an expert, L. Lamar Blount. (Doc. 68-3.) Dorazio then filed a motion to strike that testimony. (Doc. 76.) After Dorazio filed his reply in support of class certification, Allstate filed a motion to file a sur-reply. (Doc. 83.) Allstate also filed multiple notices of supplemental authority. (Doc. 90, 113.) These motions and notices are addressed first to identify which documents were considered in resolving the motion for class certification and why the court is resolving the motion now.[2]

### A. *Daubert* Motions (Docs. 76, 117, 118)

Dorazio seeks to exclude Allstate's class certification expert, Lamar Blount.

---

[2] The court provided the parties multiple separate date options over two weeks to present oral argument on these motions, but they declined. Accordingly, the court only considers the parties' written arguments. In any event, the briefing is clear enough that oral argument would not assist the court in resolving the motions.

(Doc. 76.) Blount offered opinions meant to rebut the testimony from Dorazio's expert, Dr. Lance Kaufman. (Doc. 68-3 at 3.) Dorazio argues Blount is not qualified to offer his opinions and even if qualified, Blount's opinions are irrelevant. (Doc. 76 at 2.) The court need not formally exclude Blount because even if his opinions were admissible, they would merely go to the weight, not admissibility, of Dr. Kaufman's opinions. *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993).

Allstate also recently filed *Daubert* motions seeking to exclude the expert report and testimony of Dorazio's experts Steven Guy and Dr. Kaufman. (Doc. 117, 118.) Although Allstate only challenged Guy's testimony for purposes of trial (Doc. 117 at 1), it purported to challenge Dr. Kaufman's testimony for both trial *and* class certification (Doc. 118 at 6). Allstate's challenge to Dr. Kaufman's testimony came four-and-a-half months after its opposition to Dorazio's motion for class certification. (*See* Doc. 68.) Allstate is correct that the *Daubert* deadline expired after the class certification deadline (*see* Doc. 109), but the context of the court's orders granting the parties' requested extensions to the *Daubert* deadline make clear that the deadline refers to challenges to expert testimony for purposes of trial, not class certification. (*See* Doc. 39 at 4 (setting deadlines for disclosing persons "whom they may call to trial to present evidence under FRE 702" and pre-trial disclosures and "[a]ll dispositive motions, including *Daubert* motions" after that); Doc. 109 (granting extension of pre-trial witness disclosures and "dispositive motions, including *Daubert* motions").) If Allstate reasonably expected the court to consider excluding Dr. Kaufman's opinions for purposes of class certification, it should have filed its challenge while the class certification motion was being briefed, as Dorazio did. (*See* Doc. 76.)

Nonetheless, the timing of Allstate's challenge to Dr. Kaufman's testimony is immaterial here because the court is not required to conduct a full *Daubert* analysis at the class certification stage.[3] *See Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1031 (9th Cir.

---

[3] Dorazio's responses to Allstate's *Daubert* motions are due June 16. (Doc. 109.) But issuance of this class certification order means there will be significant delay before additional motion practice and (eventually) trial, due to the need for class notifications. To ensure the rulings are fresh and appropriate for the claims and defenses that will be litigated at trial, the pending *Daubert* motions (Docs. 117, 118) are denied with leave to reinstate.

2024). Instead, a "more limited *Daubert* inquiry" may be sufficient at class certification, in which "the court considers only if expert evidence is useful in evaluating whether class certification requirements have been met." *Id*. As discussed below, Dr. Kaufman's report meets this standard.

### B. Leave to File Sur-Reply (Doc. 83)

Allstate moved for leave to file a sur-reply to address what it characterized as "substantial misstatements of fact" in a declaration filed with Dorazio's reply in support of class certification. (Doc. 83 at 2.) Courts only permit sur-replies "in the most extraordinary circumstances." *ML Liquidating Tr. v. Mayer Hoffman McCann P.C.*, No. 2:10-CV-02019-RRB, 2011 WL 10451619, at *1 (D. Ariz. Mar. 11, 2011). A reply brief that "makes a responsive argument to points raised in the response," like here, does not justify a sur-reply. *Briggs v. Montgomery*, No. CV-18-02684-PHX-EJM, 2019 WL 13039282, at *2 (D. Ariz. Mar. 19, 2019). Allstate's motion is denied.

### C. Notices of Supplemental Authority

Allstate filed a notice of supplemental authority stating the Supreme Court may soon address whether a federal court may certify a class action when some members lack any Article III injury. (Doc. 90 (citing *Lab'y Corp. of America v. Davis*, No. 24-304, 2025 WL 288305 (U.S. Jan. 24, 2025)).) On June 5, 2025, the Supreme Court dismissed the writ of certiorari in that case as improvidently granted. *Lab'y Corp. of America v. Davis*, No. 24-304, 2025 WL 1583302, at *1 (U.S. June 5, 2025). The Ninth Circuit en banc precedent Allstate believed could have been impacted remains in place. *See Olean Wholesale Grocery Coop.*, *Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) ("[W]e reject the dissent's argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.").

Allstate filed a second notice of supplemental authority regarding a decision by Judge Brnovich concluding a "a valid settlement agreement . . . affected a valid accord and satisfaction" such that the plaintiff in that case could not recover more than the single coverage limit for a UM/UIM claim. (Doc. 110 at 2 (citing *Alvarez v. CSAA Gen. Ins. Co.*,

1    No. 24-cv-00617 (D. Ariz Feb. 4, 2025).) That notice prompted Dorazio to file a lengthy

2    response (Doc. 113) and Allstate to file an objection to Dorazio's response (Doc. 114).[4]

3    The case before Judge Brnovich involved a different insurance company with different

4    policy language, facts, and arguments. In that case, Judge Brnovich found the insurance

5    company's decision to issue checks partially settling the insured's claim and releasing the

6    insurer from its total liability did not violate Arizona law prohibiting insurers from

7    misrepresenting their policy provisions because Arizona stacking law at the time was not

8    clear. *Alvarez*, 2025 WL 389140, at *5. The court need not address this argument because

9    here, Allstate's internal communications indicate it knew stacked benefits had to be paid.

10   (Doc. 81-4 at 31, 36.) Judge Brnovich's decision therefore has no impact on the class

11   certification issue here.

12       **III.    Standard**

13           For a class to be certified, Dorazio "must make two showings. First, [he] must"

14   satisfy the requirements of Rule 23(a) by "establish[ing] there are questions of law or fact

15   common to the class, as well as demonstrat[ing] numerosity, typicality and adequacy of

16   representation." *Olean*, 31 F.4th at 663 (simplified). Second, Dorazio must establish his

17   proposed class "fits into one of three categories" listed in Rule 23(b). *Id.*

18           Dorazio's motion for class certification focuses on certification of a Rule 23(b)(3)

19   class because he primarily seeks "individualized monetary" relief.[5] *Wal-Mart Stores, Inc.*

20   *v. Dukes*, 564 U.S. 338, 362 (2011). A Rule 23(b)(3) class requires the court conclude

21   "questions of law or fact common to class members predominate over any questions

22   affecting only individual members, and . . . a class action is superior to other available

23   methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

---

[4] "[T]he purpose of a Notice of Supplemental Authority is to inform the Court of a newly decided case that is relevant to the dispute before it," not to submit additional argument. *Vega v. All My Sons Bus. Dev. LLC*, 583 F. Supp. 3d 1244, 1256 (D. Ariz. 2022). The parties must limit future notices of supplemental authority and responses to 350 words excluding case captions and signature blocks.

[5] Dorazio argues he also meets the requirements for certification under Rule 23(b)(2) involving requests for injunctive relief and Rule 23(c)(4) allowing certification of "particular issues." Because these requests are made in the alternative to his request for Rule 23(b)(3) certification, there is no need to reach them.

The court must conduct a "rigorous analysis" to ensure the requirements of Rule 23(a) and 23(b)(3) have been satisfied. *Olean*, 31 F.4th at 664. The burden is on Dorazio to "actually prove—not simply plead—that [his] proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 275 (2014). Dorazio must prove each requirement by a preponderance of the evidence. *Olean*, 31 F.4th at 665.

## IV.    Rule 23(a) Factors

Although Allstate provided very limited arguments regarding the Rule 23(a) factors, the court's own rigorous analysis shows Dorazio easily meets each test.

### A. Numerosity

Rule 23(a)(1) requires a class action be certified only if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This does not require joinder be "a literal impossibility. Rather, the question is whether joinder of all class members is 'practicable'—*i.e.*, *reasonably* capable of being accomplished." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022) (simplified).

No specific number of class members is required to satisfy the numerosity requirement, but generally proposed classes of fewer than fifteen are too small and classes of more than sixty are sufficiently large. *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003). Here, Dorazio proposes a class of more than 1,600 members. (Doc. 60 at 14.) Even if the class definition is winnowed somewhat based on the statute of limitations discussed below, the class will be substantially larger than those other Arizona district courts have found to satisfy the numerosity requirement for settlement classes in the same UM/UIM insurance stacking context. *See Miller v. Trumbull Ins. Co.*, No. CV-22-01545-PHX-JJT, 2024 WL 3818608, at *4 (D. Ariz. Aug. 13, 2024); *Dale v. Travelers Prop. Cas. Ins. Co.*, No. CV-22-01659-PHX-SPL, 2024 WL 4503808, at *3 (D. Ariz. Oct. 16, 2024). "[T]he practical value of joining" each member of a class of this size is "slim to non-existent and is plainly outweighed by the substantial logistical burdens that would entail." *A. B.*, 30 F.4th at 837. Numerosity is satisfied.

### B. Commonality

Under Rule 23(a)(2), a class action must present "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A class satisfies this requirement if there is at least one question of fact or law common to the class. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013). But that common question must be such that the answer "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The proposed class shares multiple common questions.

All members of the proposed class "purchased an Allstate policy in Arizona that included multi-vehicle UM/UIM coverage and the same or substantially similar policy language." (Doc. 60 at 14.) According to Dorazio, the "policy language itself prohibited claimants" from exercising their "right to select one policy or coverage" under A.R.S. § 20-259.01(H). (Doc. 60 at 14–15.) And all members of the proposed class were subject to the same claims handling behavior in that Allstate failed to disclose to them the possibility of stacked coverages, stopped investigating the claims once the single coverage limit was reached, and then paid out the single limit. Given these similarities, the multiple common questions include:

1. Does the policy language operate as Dorazio claims?

2. Was Allstate required to disclose the possibility of stacked coverages?

3. Was Allstate required to continue to investigate after it was clear the single coverage limit would be exhausted? and

4. Did it breach the contract or violate the duty of good faith and fair dealing to refuse to disclose and pay stacked limits?

The evidence needed to answer these questions will not vary from member to member. *See Olean*, 31 F.4th at 663 ("[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member."). And answers to these questions are central to the claims. The commonality requirement is satisfied. *See Owino v. CoreCivic*, 60 F.4th 437, 444 (9th Cir. 2022) ("Commonality is necessarily established where there is a class-wide policy to which all class members are

1   subjected.").

2   ### C. Typicality

3   Rule 23(a)(3) requires that the "claims or defenses of the representative parties are

4   typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality requires

5   the other class members have the same or similar injury from the same conduct. *Parsons*

6   *v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014). The claims need not be identical to satisfy the

7   typicality requirement. *Id*. If the claims arise from a similar course of conduct and share

8   the same legal theory, certain factual differences or differing levels of damages do not

9   necessarily defeat typicality. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116–18 (9th Cir.

10  2017). Instead, the plaintiff's claims must simply be "reasonably coextensive" with those

11  of the putative class members. *Staton v. Boeing Co*., 327 F.3d 938, 957 (9th Cir. 2003).

12  Allstate in passing contests the typicality of Dorazio's claims because he only has

13  one policy but his proposed class includes individuals with one policy covering multiple

14  vehicles and individuals with multiple policies each covering one or more vehicles.

15  (Doc. 68 at 9.) In other words, Dorazio believes he was entitled to intra-policy stacking but

16  is attempting to represent a class of individuals seeking intra-policy and inter-policy

17  stacking. Allstate does not explain how the distinction between intra-policy and inter-

18  policy stacking matters for purposes of certifying a class. Nor does Allstate argue the policy

19  language or its claims handling practices were any different depending on whether the

20  insured had a single policy covering multiple vehicles or multiple policies. *Franklin* does

21  not draw a distinction between the two. *See* 532 P.3d at 1151. At present, Dorazio's claims

22  and the class claims arise out of Allstate's allegedly uniform practices regarding

23  nondisclosure and refusal to stack coverages. The typicality requirement is met.

24  ### D. Adequacy

25  Rule 23(a)(4) requires that the "representative parties will fairly and adequately

26  protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under

27  Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class

28  they seek to represent." *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quoting

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart*, 564 U.S. at 348–49 (simplified). To determine the named plaintiff's adequacy, courts ask if the representative plaintiff and his counsel (1) have any conflicts of interest with other class members, and (2) will prosecute the action vigorously on behalf of the class. *Evon v. L. Offs. of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012).

Beginning with the possibility of conflicts with other class members, only those "conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (simplified). For example, Rule 23(a)(4) was not satisfied when the named plaintiffs had an interest in "generous immediate payments," but other class members had an interest "in ensuring an ample, inflation-protected fund for the future." *Amchem Prods.*, 521 U.S. at 626. There is no such conflict here. Dorazio—like all class members—is interested in establishing stacked coverages are available and then recovering the appropriate amount of those coverages. Allstate does not dispute that Dorazio and all class members are interested in immediate payment of stacked coverages but again hints that the difference between intra-policy and inter-policy stacking is somehow important.

As discussed in the typicality context, again Allstate fails to cogently explain how the presence of class members seeking intra-policy and inter-policy stacking creates the type of conflict of interest that Rule 23(a)(4) means to address. Dorazio and all class members are interested in the immediate payment of withheld stacked coverages. Whether a class member has one or multiple Allstate policies, there is no present basis to conclude Dorazio's pursuit of his own interests will "undercut the interests of" those class members with two policies. *Kim*, 87 F.4th at 1000.

The requirement that Dorazio and his counsel be willing to vigorously prosecute this case on behalf of the class is easily satisfied. "[T]here are no fixed standards by which 'vigor' can be assayed" but "competency of counsel" is a prominent consideration. *Id.*

at 1002. Dorazio's counsel has extensive experience in class action litigation. (Doc. 60-9 at 29–33.) That counsel has diligently pursued this case, including expending thousands of hours in discovery. *Compare id.* (faulting named plaintiff and counsel for conducting no discovery), *with Miller*, 2024 WL 3818608, at *5 (addressing Dorazio's firm specifically in this context), *and Dale*, 2024 WL 4503808, at *4 (same). Dorazio and his counsel will vigorously represent the class and Rule 23(a)(4) is satisfied.

## V.    Rule 23(b)(3) Factors

The heart of the parties' certification-stage dispute concerns whether Dorazio has met the specific requirements for certification of a Rule 23(b)(3) class. Certification under Rule 23(b)(3) is appropriate when questions of law or fact common to class members predominate over questions affecting individual members, and a class action is superior to other alternatives. Fed. R. Civ. P. 23(b)(3).

It is difficult to understand most of Allstate's arguments regarding predominance because there is no dispute that all proposed class members had the same form policies with the same language, Allstate had a uniform policy of not informing proposed class members that stacked coverages were available, and Allstate paid each class member the single coverage limit. Whether Allstate's policy forms and claims handling practices complied with the parties' contract and Arizona law and whether the claims handling practices constituted bad faith are *the* crucial questions in this case. Those questions can be answered for every class member using the same evidence. And those questions are significantly more important than any questions affecting individual class members. The following analysis therefore tries to make sense of Allstate's attempts to avoid the obvious.

### A. Predominance

Predominance addresses the relationship between common and individual issues, asking "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "An individual question is one where members of a proposed class will need to present evidence that varies from member to

1    member, while a common question is one where the same evidence will suffice for each

2    member to make a prima facie showing [or] the issue is susceptible to generalized, class-

3    wide proof." *Id.* (simplified).

4        Predominance analysis begins with "the elements of the underlying cause of action."

5    *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Although this

6    analysis requires some analysis of the merits, at the certification stage a court "is merely to

7    decide [whether a class action is] a suitable method of adjudicating the case." *Edwards v.*

8    *First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015). A court must assess "the method or

9    methods by which plaintiffs propose to use the [class-wide] evidence to prove the common

10   question in one stroke." *Olean*, 31 F.4th at 666 (simplified). And the court's inquiry must

11   be "limited to resolving whether the evidence establishes that a common question is

12   *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs

13   would win at trial." *Id.* at 666–67.

14                      **1.  Breach of Contract**

15       A claim for breach of contract requires the plaintiff show "existence of the contract,

16   its breach and the resulting damages."[6] *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617,

17   621 (Ariz. Sup. Ct. 2013). The parties do not dispute the existence of valid contracts but

18   do dispute whether Dorazio can show either breach or damages on a class-wide basis.

19   Allstate makes effectively the same argument regarding breach and damages: it will require

20   "individualized valuations of each class member's claim" to determine whether the

21   putative class members suffered any injury. (Doc. 68 at 9.) That is not correct.

22       Dorazio attempts to show that all class members experienced a breach of contract

23   based on a straightforward logical chain. It is undisputed all class members were paid the

---

[6] Although it is not entirely clear from the parties' briefing, Dorazio's contract claim appears to be based on the UMA being deemed part of every insurance policy issued in Arizona. *Ins. Co. of N. Am. v. Superior Ct. In & For Cnty. of Santa Cruz*, 800 P.2d 585, 588 (Ariz. 1990) ("The terms of Arizona's uninsured motorist legislation are a part of every liability policy issued in Arizona."). When an insurer does not comply with the UMA, "the proper remedy is to include the coverage in the policy by operation of law." *Id.* In other words, the UMA provides the "sole prescribed method for limiting stacking" and if that method is not followed, stacking is required by the contract such that failure to provide stacking constitutes a breach of contract. *Franklin*, 532 P.3d at 1146.

single limit under a multi-vehicle policy and Allstate's employees testified Allstate does not pay more on claims that what is owed. Based on those premises—along with "general economics . . . and common sense" (Doc. 81 at 11)—Allstate's payment of exactly the single limit effectively admits something more is owed to each class member because an insured's costs, including medical bills and wage loss, "would never match the exact amount of a policy limit to the penny." (Doc. 60 at 11, 18–19 (citing Doc. 60-2 at 32).) In effect, Dorazio argues every class member was paid the policy limit but should have been paid at least one cent more.

Allstate counters that each class member's injury must be proven on an individual basis because payment of the single coverage limit does not mean an insured's damages reached that limit. Allstate argues it sometimes made a business decision to pay the single limit in lieu of engaging in litigation or additional negotiation. (Doc. 68 at 8.) In support, Allstate points to an analysis by its "Claims Service Leader" Greg Hamblin. That analysis allegedly shows a sizeable number—possibly as much as 16 percent—of putative class members received the single limit despite not having damages up to the single limit amount.

Allstate had Hamblin "adjust a random sample of 50 of [Allstate's] uninsured and underinsured motorist claims in which the single vehicle *per-person* limit was exhausted for any one claimant, and/or the single vehicle *per-accident* limit was exhausted for all claimants combined." (Doc. 68-1 at 6.) Some of these claims involved more than one claimant, so "the total number of claimants [Hamblin] reviewed was 89." (Doc. 68-1 at 7.) Hamblin spent approximately 15-20 hours on this task. (Doc. 68-1 at 8.) Based on his review, Hamblin concluded "14 of the 89 claimants would not have been owed any further sums even if stacked UM/UIM limits were to have been available." (Doc. 68-1 at 11.) According to Hamblin, paying the first full limit to those 14 claimants represented "business decisions" by Allstate where "the damages approached, but did not justify, a full single limit payment." (Doc. 68-1 at 11.) Allstate relies on these allegedly-uninjured 14 claimants to argue it would be improper to certify a class that includes such individuals.

But Allstate's analysis is flawed.

Dorazio provided evidence showing Allstate's practice was to stop investigating or demanding documentation once it determined the single coverage limit would be paid. Allstate claims adjusters testified they did not continue to investigate any potential additional loss amount after confirming Allstate owed the policy limit. (Doc. 60-7 at 30 (testifying "the adjuster [would not] continue to investigate facts supporting additional loss amount" once it was clear the limits would need to be paid); (Doc. 60-6 at 33 (testifying the adjuster "wouldn't ask the attorney to provide more" supporting facts if she "had enough information to confirm that Allstate owed the limits") Doc. 60 at 34 ("[A]t least some of [the] files where [Allstate] paid limits, that file doesn't have all of the medical records and bills that this person actually incurred from an accident.").)

Despite Allstate's practice of not fully investigating claims, Hamblin "didn't go out and solicit any additional information beyond what was in the file." (Doc. 81-4 at 57.) And when he was asked about specific files he reviewed where the insured allegedly was paid more than what Allstate owed, Hamblin was unable to provide any plausible explanation for the valuations he assessed. (Doc. 81-4 at 60.) Without complete files, it would not be possible for Hamblin or any other adjuster to accurately calculate what Allstate would owe if coverages could be stacked.

Dorazio does not have definitive evidence that Allstate was unwilling to pay more than claims were worth but it appears more likely than not that Allstate was not routinely doing so. Even under Hamblin's numbers (and including incomplete investigations), 84 percent of putative class members were injured. Then, when considering those who Hamblin agrees were owed small amounts but discounted nonetheless—such as a claimant owed an additional $0.30 (Doc. 69-1 at 13)—and those who were owed more but whose files were incomplete and not fully considered by Hamblin (Doc. 81-6 at 3–4)—it is more likely than not that the remaining the number of uninjured class members is de minimis. *See Olean*, 31 F.4th at 669. And as discussed below, any tiny number of these individuals can be identified and removed in damages proceedings later.

Connected to its arguments regarding breach of contract and damages, Allstate argues Dorazio has not provided a "valid measure of class-wide damages." (Doc. 68 at 12.) Allstate believes Dorazio's proposed formula for calculating class-wide damages is flawed and certification is not appropriate because damages must be calculated individually. (Doc. 68 at 12.) Allstate's position appears to proceed from the mistaken premise that the *amount* of class-wide damages, as opposed to the *fact* of class-wide damages, must be precisely measurable at the certification stage. But there is no requirement that a plaintiff propose a valid method for assessing the amount of class-wide damages at the certification stage, as the Ninth Circuit has made abundantly clear. *See Vaquero v. Ashley Furniture Industries, Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) (plaintiffs seeking certification must "prove that damages resulted from the defendant's conduct," not that damages can be assessed on a class-wide basis); *Ridgeway v. Walmart Inc*, 946 F.3d 1066, 1086 (9th Cir. 2020) ("Time and time again, this court has reaffirmed the principle that the need for individual damages calculations does not doom a class action.").

Dorazio has indicated he plans to present an aggregate damages model based on an analysis prepared by his expert Dr. Kaufman. (Doc. 60-1 at 20.) Dr. Kaufman's opinions are admissible and he is qualified to conduct this analysis, at least under the more limited *Daubert* inquiry applicable at the class certification stage. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018); *Lytle*, 114 F.4th at 1031.

In 2013, Dr. Kaufman obtained his Ph.D. in economics from the University of Oregon. (Doc. 60-1 at 21.) Since 2013, he has worked as an economist and his current position is Principal Economist for Aegis Insight and Bardwell Consulting. (Doc. 60-1 at 21.) He has been qualified as an expert in multiple courts and has experience performing "economic analysis and modeling of firms, markets, and individuals, including economic damages, lost profits, and lost earnings." (Doc. 60-1 at 20.)

Dr. Kaufman provided a formula that calculates aggregate harm to class members by estimating the settlement payments they would have received but for Allstate's (non-)stacking policy using the cumulative distribution of the underlying value of a claim

derived from a sample of claims. (Doc. 60-1 at 10.) This value can be estimated because settled claims follow an observable pattern and uncompensated loss follows a continuous distribution, which Dr. Kaufman reflects through established statistical tools including Kaplan-Meyer analysis, Log-Rank testing, and Weibull-mixture model. (Doc. 60-1 at 10, 12.) *See Moshier v. Safeco Ins. Co. of Am.*, No. CV-23-00225-PHX-DLR, 2024 WL 4503901, at *3 (D. Ariz. Oct. 16, 2024) (identifying Kaplan-Meyer curves and Weibull mixture models as "established statistical tools").

Allstate does not dispute Dr. Kaufman's qualifications to conduct this type of statistical analysis in its *Daubert* motion or by providing its own counter-expert. It instead argues Dr. Kaufman's approach "is inherently flawed" because following an aggregate damages approach will mean some class members are "underpaid or overpaid, or paid when they are owed nothing at all" (Doc. 68 at 12), which is a challenge to the assumptions and inputs on which Dr. Kaufman's analysis is based rather than his methodology itself. But a challenge to the model's assumptions as to individual claimants differs from a challenge to the model's validity in measuring the *fact* of damages on a class-wide basis. *See Olean*, 31 F.4th at 679 ("While individualized differences among" class members "may require a court to determine *damages* on an individualized basis . . . such a task would not undermine the regression model's ability to provide evidence of common *impact*."). And to the extent Allstate purports to challenge aggregate damages models more generally, the Ninth Circuit has rejected that argument. *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1140 (9th Cir. 2016) ("establishing liability for underpayment in the aggregate is a permissible means of proceeding.").

The court agrees the *degree* of injury may be individualized here and therefore declines to endorse Kaufman's estimated damages amount—or anything more than his model's utility at proving the fact of common injury—at this stage. Once aggregate damages are calculated, "the partitioning of damages among class members may lead to individual calculations." *Id.* But the need for such partitioning does not defeat certification. That the vast majority of class members were injured to some degree by the same injury-

producing behavior is susceptible to exactly the sort of class-wide statistical proof Kaufman provides. *See Just Film*, 847 F.3d at 1120 ("[P]laintiffs must show . . . the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory.").

To the extent less-injured or even uninjured class members remain at the damages stage, the court may use a mechanism to identify and remove them later in the litigation. *See Vaquero*, 824 F.3d at 1156 ("The district court has discretion to shape the proceedings . . .[and] could choose an option such as the use of individual claim forms or the appointment of a special master, which plainly would allow Defendants to raise any defenses they may have to individual claims."); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 32 (1st Cir. 2015) (concluding presence of uninjured class members does not defeat class certification where mechanism exists to identify them). For instance, Allstate can easily identify claims whose net tort value it believes does not reach the first policy limit. (Doc. 68-1 at 10.) As Dorazio identified in at least some instances, these valuations are based on incomplete calculations and do not always reflect the full value owed to the claimant without the stacking limit. (Doc. 81-6 at 3–4.) In the same way damages can be evaluated individually, Allstate can readjust, after a complete investigation, the values of any remaining claims that fall below the stacking limit—which by its own analysis is a very small percentage of the total claims at issue.

Dorazio's proposed methods for proving the existence of a contract, breach, and damages can be performed on a class-wide basis using the same evidence. The common issues do not just predominate, they overwhelm any possible individual ones. The predominance requirement is met for Dorazio's breach-of-contract claim.

## 2. Bad Faith

Bad faith claims arise in the insurance context "when the insurance company intentionally denies, fails to process or pay a claim without a reasonable basis for such action." *Cavallo v. Phoenix Health Plans, Inc*., 518 P.3d 759, 764 (Ariz. 2022). A plaintiff must show the insurer: (1) "acted unreasonably toward its insured," and (2) "acted knowing

that it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed to it." *Miel v. State Farm Mut. Auto. Ins. Co.*, 912 P.2d 1333, 1339 (Ariz. Ct. App. 1995).

Allstate argues bad faith must be individually determined because, on their face, the elements of this claim "are not susceptible to common proof." (Doc. 68 at 14.) Allstate also claims any bad faith inquiry must consider "the objective reasonableness" of Allstate's willingness to stack policies "based on the state of the law at the time the claim was handled." (Doc. 68 at 15.) Allstate's arguments are not convincing.

For class certification purposes, the crucial question is whether Allstate's objective reasonableness can be determined on a class-wide basis, not whether it actually acted unreasonably in any particular case. The clarity of Allstate's legal obligations was the same throughout the class period. An insurer's duty to provide accurate information to its insured is well-established. Although "an insurer is not required to explain every fact and provision without limitation . . . the duty of good faith encompasses some obligation to inform the insured about the extent of coverage and his or her rights under the policy and to do so in a way that is not misleading." *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 277 P.3d 789, 800 (Ariz. Ct. App. 2012). The Arizona Administrative Code even more clearly requires an insurer disclose "all pertinent benefits [and] coverages." *Id.* (quoting Ariz. Admin. Code. R20-6-801(D)(1)). Allstate's 30(b)(6) witness conceded adjusters must disclose the available policy limits. (Doc. 60-4 at 22.) If stacked coverage limits were available, Allstate's uniform practice of not informing insureds about those limits supports a claim for bad faith.

Allstate's claim handling practices were also the same throughout the class period and there is evidence—which could be used for all class members—that Allstate knew its practices were unlawful. For example, internal correspondence between an Allstate supervisor and claims adjusters states that if an attorney had not demanded stacked coverages, only single coverage limits should be offered. (Doc. 81-4 at 46.) In other internal correspondence before the subsection (H) letters allegedly began to be sent out in

2021, an Allstate employee acknowledged Allstate would be "forced to stack UIM coverage." (Doc. 81-4 at 46.) This evidence could be used by all class members to show Allstate "acted knowing that it was acting unreasonably." *Miel*, 912 P.2d at 1339.

Dorazio's bad faith claim presents common questions that can be resolved for all class members in a single stroke. Predominance is satisfied for purposes of the bad faith claim.

### 3. Remaining Defenses

Allstate raises three additional reasons why common questions do not predominate that apply to both breach of contract and bad faith. None of these arguments defeat predominance.

First, Allstate argues it began providing subsection (H) notices in February 2021. (Doc. 68 at 16.) It argues these subsection (H) notices were sufficient to prohibit stacking. (Doc. 68 at 16.) Dorazio disputes whether Allstate's subsection (H) letters were effective because the policy language (which was still in effect) takes away the choice between applicable coverage the letter supposedly protected. (Doc. 91 at 14.)

At this stage, the court must determine whether "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453 (quotation omitted). The issue whether the subsection (H) letters were effective is not an individualized question because the letters all took the same form. The efficacy of those letters can be resolved at the same time and would apply to each class member who received one.

Second, Allstate argues many class members' claims will be barred by the existence of a release. (Doc. 68 at 19.) A release is valid under Arizona law unless there is concealment of material information or mutual or unilateral mistake. *Hendricks v. Simper*, 539 P.2d 529, 532–34 (Ariz. Ct. App. 1975). Dorazio argues Allstate concealed claimants' right to stack their policies, allegedly making the releases ineffective. (Doc. 60 at 21.) Whether the releases are effective is another question common to the class—or the subclass of individuals who signed one—and does not defeat predominance. If the releases are

effective, their existence can be readily determined from a claim file and class members who released their claims can be manually removed. *Bultemeyer v. CenturyLink Inc.*, No. CV-14-02530-PHX-SPL, 2023 WL 1472831, at *4 (D. Ariz. Feb. 2, 2023) (manual adjustment not a bar to certification).

Finally, Allstate argues individualized issues of whether a class member's claim is barred by the statute of limitations will predominate. (Doc. 68 at 17.) Hamblin identified approximately 48 percent of claims in a representative sample as barred under the statute of limitations. (Doc. 68-1 at 14.) An insured has three years from the date of an accident to report a UM or UIM claim and three years after providing that notice to file suit. *Creasman v. Farmers Cas. Ins. Co.*, 681 F. Supp. 3d 1051, 1060 (D. Ariz. 2023). Hamblin's analysis shows that the presence and date of a written demand for UM/UIM benefits can be readily determined from a file review. In this situation, refining the class definition—not denying certification—is the appropriate way to handle statute of limitations issues. *Bultemeyer*, 2023 WL 1472831, at *4 ("[T]he need for a manual review of individual information in order to identify class members is not a bar to certification" but "an administrative issue").

### B. Superiority

Dorazio must also show his proposed "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

"Generally, the factors relevant to assessing superiority include '(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.'" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(b)(3)(A) –(D)). "This list is not exhaustive" and

the superiority requirement requires the court assess if class action would be "efficient and . . . fair." *Id.* at 1175–76.

Here, there is no indication class members are interested in controlling the prosecution of separate actions, nor is there any other pending litigation already initiated by these class members. Given the significant number of common issues, it is desirable to concentrate litigation in a single forum and there are no concerns that the properly-defined classes will be unmanageable. The filing of potentially more than 1,600 cases involving identical facts and causes of action would be an inefficient use of the court's and parties' resources. *McClure v. State Farm Life Ins. Co.*, 341 F.R.D. 242, 254 (D. Ariz. 2022) (finding superiority where "case involves the interpretation of a form contract, the interpretation of which will apply to all class members making class action an efficient form of adjudication").

Allstate argues putative class members' claims are better litigated separately because Dr. Kaufman's damages model potentially allows recovery of a minimum of $15,000 per individual. (Doc. 68 at 19–20.) "Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190–91 (9th Cir. 2001) (concluding minimum $50,000 recovery "for each putative class member does not argue persuasively for class certification"). But according to Allstate's own analysis, many class members will have suffered a lower amount of damages. And as discussed above, the court has only evaluated Dr. Kaufman's model for its ability to assess the fact of damages, not the amount of damages, at this stage.

A class action is superior and all requirements for class certification are met.

## VI.    Class and Subclass Definitions

Dorazio's proposed class definition includes individuals "from the earliest allowable time to the date judgment enters." (Doc. 60 at 13.) This proposed class definition is not workable due to the lack of specificity in its starting and ending dates. Notice must be provided to all class members and they must have an opportunity to opt out of the class.

Fed. R. Civ. P. 23(c)(2)(B). To provide such notice, the court must set a date-certain so that class members can be identified. In addition, it would not be practical to define a class as including those up "to the date judgment enters" because there may be no opportunity for newly-added class members to opt out. The class definition must be revised to include date ranges. *See Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 575 (N.D. Cal. 2018) ("[D]istrict courts have broad discretion to modify class definitions.").

Arizona law provides an insured three years from the date of an accident to report a UM/UIM claim and then three years from the date of the report to file suit. *Creasman*, 681 F. Supp. 3d at 1060. This suit was filed on December 1, 2022. (Doc. 1-3 at 7.) To account for that, the main class is defined as:

> All insureds who reported a UI/UIM claim to Allstate no earlier than December 1, 2019, up through the date of certification of the class, for an accident that occurred no earlier than December 1, 2016, and were covered by one or more Allstate policies issued in Arizona to the same purchaser covering multiple vehicles at the time of a covered loss who received UM/UIM benefits in an amount equal to the limits of only one of the UM/UIM coverages under the applicable policy or policies.

Bad faith claims are governed by a two-year statute of limitations. *Ness v. W. Sec. Life Ins. Co.*, 851 P.2d 122, 125 (Ariz. Ct. App. 1992). Such claims "do not begin to accrue until an insurer intentionally and unreasonably issues a final denial of coverage." *Satamian v. Great Divide Ins. Co.*, 545 P.3d 918, 929 (Ariz. 2024). With December 1, 2022, as the filing date, all class members who had a "final denial of coverage" before December 1, 2020, cannot pursue their claims now. To account for this, a subclass is defined as:

> All insureds who received a final denial of stacked UI/UIM coverages no earlier than December 1, 2020, up through the date of certification of the class, and were covered by one or more Allstate policies issued in Arizona to the same purchaser covering multiple vehicles at the time of a covered loss who received UM/UIM benefits in an amount equal to the limits of only one of the UM/UIM coverages under the applicable policy or policies.

Using these definitions, the parties must identify the members of the class and subclass and file a joint status report containing a proposed notice plan.

1

## VII.    Summary Judgment

On February 19, 2025, Dorazio filed a motion for summary judgment. (Doc. 92.) That motion is fully briefed, but it is premature.

"[D]istrict courts generally do not grant summary judgment on the merits of a class action until the class has been properly certified and notified." *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995). When a Rule 23(b)(3) class is certified, Rule 23(c)(2) provides "the court shall direct to the members of the class the best notice practicable under the circumstances." The "purpose" of this requirement "is to ensure that the plaintiff class receives notice of the action well *before* the merits of the case are adjudicated." *Id*. at 295. And "notice must be sent *before* a judgment has been granted." *Id.* at 296*; see also Nia v. Bank of Am., N.A.*, 725 F. Supp. 3d 1150, 1167 (S.D. Cal. 2024) (finding "motion for partial summary judgment prior to class certification is untimely and unfair on the grounds of the one-way intervention rule"). The limited exceptions to this requirement do not apply to Dorazio's motion.

One exception is when the class is certified under Rule 23(b)(2). That type of class does not provide any "ability for class members to opt out." *Emami v. Mayorkas*, 725 F. Supp. 3d 1046, 1054 (N.D. Cal. 2024). Accordingly, in that scenario, resolving disputed issues on their merits before class certification is permissible. *Id.* at 1054–55. Dorazio sought certification of a (b)(2) class in the event his request for a (b)(3) class were denied. But a (b)(3) class is appropriate, which means addressing the merits of Dorazio's claims before providing notice would be inappropriate. Dorazio's motion for summary judgment, response, and reply may be renewed after class members have been notified and given the opportunity to opt-out.

Another exception is when the defendant—not the plaintiff—seeks judgment before class certification. *Schwarzschild*, 69 F.3d at 295. In that circumstance, a court may resolve the motion on its merits, although any result "binds only the named plaintiffs." *Id.* at 297. This exception does not apply to Dorazio's motion, but it could apply to Allstate's (Doc. 119).

However, Allstate's motion for summary judgment indicated it plans to file another motion for summary judgment if the court certifies a class. (Doc. 119 at 5 n.1.) This court typically only allows one summary judgment motion per party. *See* District of Arizona Judges' Orders, Forms & Procedures → Lanham, Krissa M → Case Management Order at 6, *available at* https://www.azd.uscourts.gov/sites/azd/files/judge-orders/KML%20Case%20Management%20Order.pdf. To allow the court to consider both parties' motions concurrently and all arguments at once, the court therefore also denies Allstate's motion for summary judgment. Allstate may renew its motion for summary judgment addressing issues relevant to both Dorazio and absent class members in one motion.

The parties must submit a proposed revised briefing schedule as part of their joint status report proposing how the court should proceed regarding notice to class members.

Accordingly,

**IT IS ORDERED** granting Dorazio's Motion for Class Certification certifying the two classes listed above. (Doc. 60.)

**IT IS FURTHER ORDERED** designating plaintiff Brian Dorazio as Class Representative for the class and appointing Hagens Berman Sobol Shapiro LLP as Class Counsel.

**IT IS FURTHER ORDERED** denying Dorazio's Motion to Strike Testimony and Report of L. Lamar Blount. (Doc. 76.)

**IT IS FURTHER ORDERED** denying Allstate's Motion for Leave to File a Sur-Reply. (Doc. 83.)

**IT IS FURTHER ORDERED** denying Dorazio's Motion for Summary Judgment. (Doc. 92.)

**IT IS FURTHER ORDERED** denying Allstate's Motion to Exclude Expert Report and Testimony of Steven Guy with leave to reinstate closer to trial. (Doc. 117.)

**IT IS FURTHER ORDERED** denying Allstate's Motion to Exclude Expert Report and Testimony of Lance Kaufman with leave to reinstate closer to trial. (Doc. 118.)

1  **IT IS FURTHER ORDERED** denying Allstate's Motion for Summary Judgment.

2  (Doc. 119.)

3  **IT IS FURTHER ORDERED** the parties shall limit future notices of supplemental

4  authority and responses to 350 words excluding case captions and signature blocks.

5  **IT IS FURTHER ORDERED** no later than **June 24, 2025**, the parties shall file a

6  joint status report explaining how the court should proceed regarding providing notice to

7  class members. The filing must also contain proposed deadlines for dispositive motions

8  and *Daubert* motions in light of the notice schedule.

9  **IT IS FURTHER ORDERED** denying the Stipulation (Doc. 120) as moot.

10  Dated this 10th day of June, 2025.

11

12

13  _____

14  **Honorable Krissa M. Lanham**
    **United States District Judge**

15

16

17

18

19

20

21

22

23

24

25

26

27

28