**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Brian Dorazio,

Plaintiff,

v.

Allstate Fire and Casualty Insurance Company,

Defendant.

No. CV-23-00017-PHX-KML

**ORDER**

This class action concerns whether Allstate validly limited the stacking of uninsured motorist ("UM") and underinsured motorist ("UIM") coverages under Arizona law. Allstate moves to decertify the class, for summary judgment on all claims, and to exclude two experts. Dorazio moves for partial summary judgment on the availability of stacked coverage. Because Allstate's policy automatically selected the applicable coverage rather than preserving the insured's statutory right to choose, it did not comply with A.R.S. § 20-259.01(H). Dorazio's motion is granted, and Allstate's motions to decertify and for summary judgment are denied. The expert motions are denied without prejudice to renewal before trial.

## I. Background

A more detailed background appears in the court's class-certification order. (Doc. 121 at 1–6.) This class action concerns "stacking," through which an insured combines UM/UIM coverages purchased for multiple vehicles and applies them to a single accident or claim. The court certified a class consisting of Arizona Allstate insureds who timely

submitted covered UM/UIM claims under policies insuring multiple vehicles but received benefits equal to only one coverage limit (*i.e.*, unstacked coverage), with a subclass limited to certain members asserting bad-faith claims. (Doc. 121 at 25–26.)

All the policies at issue contain the same relevant language. (Doc. 60-4 at 41.) Each policy contains declarations identifying the UM/UIM limits applicable to each person and accident. (Doc. 60-5 at 8.) If a single policy covers multiple vehicles, Allstate requires the UM/UIM limits to be identical for every vehicle. (Doc. 119-2 at 3.) The general provisions of Allstate's policies also dictate which vehicle's coverage applies following an accident. When an insured vehicle is involved in an accident, "the coverage limits of the involved auto will apply." (Doc. 60-5 at 18.) When no listed vehicle is involved, the highest limits shown for any insured vehicle apply. (Doc. 60-5 at 18.) The policies do not otherwise give insureds a right to select one policy or coverage. (*See* Docs. 60-4 at 41–44; 60-5 at 35–38.)

Allstate's policies also included stacking prohibitions. A general provision states the limits applicable to one vehicle "will not be combined with or added to" the limits applicable to another vehicle, even when Allstate charges separate premiums for the vehicles. (Doc. 60-5 at 18.) The UM/UIM provisions similarly state the per-person limit is the maximum Allstate will pay regardless of the number of vehicles shown on the declarations page and provide: "NO STACKING OR AGGREGATION OF UNINSURED MOTORISTS INSURANCE WHATSOEVER WILL BE ALLOWED BY THIS POLICY." (Doc. 60-5 at 35–36.) This was the only policy language disallowing stacking. (Doc. 60-4 at 41–42.)

Allstate's relevant claims-handling practices remained generally consistent throughout the class period. Allstate recognized an obligation to disclose available policy limits and not conceal benefits or coverages pertinent to a claim. (Doc. 60-4 at 22.) But Allstate instructed adjusters that its policies did not permit stacking, and adjusters did not disclose to insureds the potential availability of stacked limits. (Docs. 60-4 at 25; 60-6 at 21; 60-7 at 33.) Allstate also stopped developing a claim after determining the claimant's damages exceeded the single coverage limit; once the available records established

damages worth more than the single limit, Allstate generally tendered that limit without seeking information about any additional losses. (Docs. 60-4 at 27; 60-7 at 30.)

Allstate nevertheless sometimes paid stacked benefits. Allstate's corporate representative estimated it paid stacked benefits 15 to 25 times from 2019 through 2024. (Doc. 60-4 at 57.) When a claimant challenged Allstate's stacking position, Allstate referred the matter to its claims-litigation personnel and considered the potential claim value, defense costs, and venue. (Doc. 60-4 at 58.) Allstate maintains those payments reflected discretionary business decisions rather than coverage obligations. (Doc. 60-4 at 59.) Other evidence reflects Allstate did not offer stacked benefits unless specifically requested but paid stacked limits whenever attorneys demanded them. (Doc. 81-4 at 31-32, 36.) Allstate's corporate representative could not identify another benefit excluded by the policy that Allstate regularly paid. (Doc. 60-4 at 60.) Internal correspondence also instructed adjusters to offer only the single limit absent an attorney demand and recognized Allstate could be "forced to stack UIM coverage." (Doc. 81-4 at 47.) After the class was certified, Allstate conducted a review that identified 42 potential class members it characterizes as having received stacked benefits. (Doc. 137-1 at 12.)

Before 2021, Allstate did not send UM/UIM claimants written notice of a right to select one policy or coverage. (Doc. 60-4 at 51–52.) In February 2021, in response to challenges from claimants and their attorneys, Allstate began sending form letters intended to satisfy A.R.S. § 20-259.01(H)'s notice requirement. (Doc. 60-4 at 51–53.) The letters informed recipients that if multiple applicable policies or coverages existed, the insured could select one policy or coverage to apply to the accident and no other Allstate coverage would apply. (Docs. 139 at 7–8, 13; 139-1 at 2; 139-2 at 2.) There is no evidence Allstate amended the relevant policy language stating "the coverage limits of the involved auto will apply." (Doc. 60-5 at 18.) The letters thus purported to offer insureds a choice foreclosed by the policy language. Allstate's post-certification review identified 581 potential class members who received such letters. (Docs. 137 at 16–17; 137-1 at 11.)

Dorazio's claim illustrates these practices. His Allstate policy insured four vehicles

and listed UM limits of $100,000 per person and $300,000 per accident. (Doc. 60-5 at 6, 8.) In January 2021, Dorazio's daughter, A.D., suffered serious injuries as a passenger in one of the vehicles insured under Dorazio's policy when an uninsured nonparty caused an accident. (Docs. 1-3 at 7; 60-5 at 6.) Allstate's investigation valued A.D.'s claim at $212,475, more than twice the single per-person limit. (Doc. 60-4 at 27.) Through counsel, Dorazio demanded "the immediate tender of all applicable uninsured motorist policy limits." (Doc. 60-8 at 3.) Despite knowing the claim exceeded the single coverage limit and that stacking was sometimes offered, Allstate did not disclose or pay stacked coverage and instead paid $100,000. (Docs. 60-4 at 27; 60-7 at 23.)

Dorazio filed this action asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief. (Docs. 1-3 at 7, 12–13; 21 at 3–4.) In June 2025, the court certified a class consisting of Arizona Allstate insureds who timely submitted covered UM/UIM claims under policies insuring multiple vehicles but received benefits equal to only one coverage limit, with a subclass limited to certain members asserting bad-faith claims. (Doc. 121 at 25–26.) The contract class covers claims reported to Allstate from December 1, 2019, through June 11, 2025, arising from accidents occurring on or after December 1, 2016. (Doc. 121 at 25.) The bad-faith subclass covers final denials of stacked UM/UIM coverage from December 1, 2020, through June 11, 2025. (Doc. 121 at 25.) Allstate's class-notice list contains approximately 1,781 potential members.[1] (Doc. 137 at 4–5.) Its post-certification review identified 180 listed claimants who signed releases when accepting payment. (Docs. 137 at 16–17; 137-1 at 12.)

The value of some class members' claims remains disputed. Before certification, Allstate's Claim Services Leader, Greg Hamblin, reviewed 50 claim files involving 89 claimants and concluded 14 would not have received additional payments even if stacked limits were available. (Doc. 68-1 at 6–11.) But Allstate generally stopped investigating

[1] Allstate seeks summary judgment as to the "42 class members who were already paid stacking." (Doc. 139 at 16.) The parties agree individuals already paid stacked benefits are not part of the class. (*See* Docs. 139 at 16; 151 at 13–14; 164 at 11–12.) That said, summary judgment is not an appropriate mechanism for deciding whether particular individuals fall within the certified class. Any disputes regarding the class list should be addressed through the ordinary class-administration process.

once the available evidence established damages exceeding the single limit, so its files did not necessarily contain evidence of additional medical expenses, future treatment, lost income, or noneconomic losses. (*See* Docs. 60-4 at 27; 60-6 at 33; 60-7 at 30.) Hamblin did not obtain information beyond what appeared in those files. (Doc. 81-4 at 57.) The court concluded that without complete files, it would be impossible for Hamblin to accurately determine what Allstate would owe if coverages could be stacked and that, even taking Hamblin's review into account, the number of uninjured class members would likely be de minimis. (Doc. 121 at 17.) Nevertheless, after certification narrowed the relevant population, Hamblin conducted a supplemental review using claims remaining from the original sample and additional files replacing claims outside the limitations period. (Doc. 137-1.) Allstate now maintains 10 of 79 reviewed claimants would not have been owed additional benefits because their damages did not exceed the single limit, and extrapolates that 12.6% of the class is uninjured. (Doc. 137 at 4–6, 18.)

Dorazio moves for partial summary judgment seeking a declaration that class members were entitled to stack their UM/UIM coverages. (Doc. 143.) Allstate moves for class decertification (Doc. 137) and summary judgment (Doc. 139) on all claims. It also moves to exclude the reports and testimony of Dorazio's experts, Lance Kaufman (Doc. 140) and Steven Guy (Doc. 141).

## II. Motion to Decertify Class

Allstate moves to decertify the contract class and bad-faith subclass, arguing new evidence and intervening Ninth Circuit authority establish that individual questions of injury predominate over common questions. (Doc. 137 at 11–21.)

In certifying the class, the court previously found the central questions predominated and were substantially more important than any individual issues. (Doc. 121 at 14, 20.) That order rejected Allstate's argument that individualized claim valuations defeated class certification because Allstate routinely stopped developing claim files once it decided to pay the single limit. (Doc. 121 at 16–17.) This made Hamblin's retrospective valuations unreliable because they were based on incomplete files and he did not obtain

any additional information regarding the analyzed claims, nor could he plausibly explain some of his valuations. (Doc. 121 at 16–17.) Hamblin's supplemental declaration suffers from the same issues as his first and presents an additional disclosure problem.

As to the new problem, Hamblin relies on documents and information Allstate did not disclose during discovery. (Doc. 152 at 7–10.) Allstate appears to agree the information should have been produced but was not, arguing any non-disclosure was harmless. (Doc. 163 at 11–13.) Rules 26(a)(1)(A)(ii) and 26(e)(1)(A) require disclosure and timely supplementation of information a party may use to support its claims or defenses, and Rule 37(c)(1) generally precludes using undisclosed information to supply evidence on a motion unless the failure was substantially justified or harmless. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106–07 (9th Cir. 2001) (placing the burden of showing harmlessness on the nondisclosing party). Allstate has not shown that its failure was harmless, but the analysis would not change even if the court excused the untimely disclosure. Hamblin's new declaration again relies on Allstate's existing claim files and does nothing to obtain updated medical records, develop wage-loss evidence, investigate continuing pain or impairment, or otherwise attempt to construct the record that would have existed had Allstate recognized higher available limits.

The numerical results of Hamblin's supplemental claims review also do nothing to improve Allstate's showing. Hamblin's declaration at class certification identified 14 of 89 claimants—approximately 15.7%—as allegedly uninjured. The supplemental declaration in support of decertification identifies 10 of 79—or 12.6%—as uninjured. This new, lower estimate gives the court no reason to doubt its prior finding. The original order already considered a higher raw estimate and found the true number likely to be de minimis after accounting for the review's deficiencies, the claimants Hamblin conceded were underpaid but only by small amounts, and the incomplete files that possibly obscured additional losses. Hamblin's lower supplemental estimate, produced through materially the same process, does not undermine that reasoning.

Intervening case law also does not change the analysis. To start, even Allstate

recognizes the new case it cites merely "reaffirm[ed]" authority that existed before the class certification order. (*See* Doc. 137 at 12–13 (discussing *Ambrosio v. Progressive Preferred Ins. Co.*, 154 F.4th 1107 (9th Cir. 2025)).) Neither *Ambrosio* nor the line of doctrine it reaffirmed applies here. The putative class in *Ambrosio* challenged an insurer's total-loss valuation method that did not result in an across-the-board underpayment, and which was not barred by the policy terms or state law. 154 F.4th at 1111–12. Accordingly, every class member needed an individualized valuation to determine whether the amount received was less than the amount actually owed. *Id.* at 1110–13. That created a dispute not "over the amount of any individual's damages, which would be insufficient to prevent class certification, but over an essential element of each individual [putative class member's] claim." *Id.* at 1111. Here, Allstate applied the same coverage limitation to every class member and paid each member exactly the amount it treated as the maximum available. The court previously found it more likely than not that only a de minimis number of class members had received all benefits owed, and nothing about Hamblin's supplemental review undermines that finding. Unlike in *Ambrosio*, individualized valuation is therefore not necessary to establish injury for every class member.

Instead, *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC* continues to supply the governing framework. 31 F.4th 651 (9th Cir. 2022) (en banc). Under *Olean*, the possible presence of more than a de minimis number of uninjured class members does not categorically preclude certification, with the relevant predominance question asking whether individualized inquiries will "overwhelm common ones and render class certification inappropriate." *Id.* at 668–69 (simplified). This requires the court to make a qualitative determination whether the common issues "are more prevalent or important than the non-common . . . issues." *Id.* at 664 (simplified).

Here, individualized inquiries concerning the extent of damages will not overwhelm the common questions. *See Ambrosio*, 154 F.4th at 1111 ("a dispute over the amount of any individual's damages . . . would be insufficient to prevent class certification"). These common questions include whether Allstate's uniform policy language validly limited

stacking, whether Allstate breached the policies by withholding stacked coverage, and whether its uniform claims-handling practices were reasonable, which can be answered "in one stroke" for all class members. *Olean*, 31 F.4th at 664. The issues surrounding individual damages in this case, like in many others, do not predominate over the critical and common issues. *Id.* at 669 (class may be appropriate "even if plaintiffs have to prove individualized damages at trial"). Any small number of insureds who cannot prove compensable losses exceeding the amount paid may be denied recovery through later damages proceedings. The motion to decertify is denied.

## III. Motions for Summary Judgment

The parties filed competing motions for summary judgment. Dorazio seeks partial summary judgment on his declaratory-relief claim, requesting a classwide ruling that Allstate's policy failed to comply with subsection (H) and that Dorazio and the class may stack the UM/UIM coverages purchased for each vehicle insured under their Allstate policies. (Doc. 143.) Allstate seeks summary judgment on all claims and raises several classwide and member-specific defenses. (Doc. 139.)

### A. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual

dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

**B. Analysis**

**1. Availability of Stacking**

Subsection (H) of Arizona's Uninsured/Underinsured Motorist Act ("UMA") is "the only . . . provision that authorizes any limitation of UM or UIM coverage." *Am. Fam. Mut. Ins. Co. v. Sharp*, 277 P.3d 192, 196 (Ariz. 2012). It supplies "the sole prescribed method" for limiting the stacking of coverages purchased for different vehicles. *Franklin v. CSAA Gen. Ins. Co.*, 532 P.3d 1145, 1147 (Ariz. 2023). Subsection (H) reads as follows:

> If multiple policies or coverages purchased by one insured on different vehicles apply to an accident or claim, the insurer may limit the coverage so that only one policy or coverage, *selected by the insured*, shall be applicable to any one accident. If the policy does not contain a statement that informs the insured of the insured's right to select one policy or coverage as required by this subsection, within thirty days after the insurer receives notice of an accident, the insurer shall notify the insured in writing of the insured's right to select one policy or coverage.

A.R.S. § 20-259.01(H) (emphasis added).

To limit stacking, an insurer must "(1) expressly and plainly limit stacking in the policy and (2) satisfy the notice requirement informing the insured of their 'right to select one policy or coverage' either in the policy itself or in writing to the insured within thirty days after the insurer is notified of the accident." *Franklin*, 532 P.3d at 1148. Stacking is available unless the insurer satisfies both requirements. *Id.*

Subsection (H) applies to intra-policy and inter-policy stacking. *Id.* at 1151. A multi-vehicle policy necessarily provides separate UM/UIM coverage for each insured vehicle, even when the insurer describes the policy as providing only one coverage. *Id.* at 1146, 1150–51. Allowing an insurer to avoid subsection (H) through "creative policy drafting," including "technical definitions of coverages," would permit circumvention of the statute.

*Id.* at 1146. Moreover, Arizona's 1997 amendments to subsection (H) "explicitly recogniz[ed] intra-policy stacking" and established that subsection as "the sole means by which insurers may limit intra-policy stacking." *Id.* at 1151.

To fall within subsection (H)'s safe harbor, an insurer must preserve the insured's statutory right to select the applicable policy or coverage. *State Farm Mut. Auto. Ins. Co. v. Lindsey*, 897 P.2d 631, 633–34 (Ariz. 1995). Policy language mechanically assigning the applicable policy based on which insured vehicle was involved in the accident fails that requirement because it "quite literally eliminates the insured's right to select any other policy." *Id.* at 633. Nor may an insurer excuse noncompliance merely because the available coverages carry identical limits. *Id.* The insured's selection can have consequences apart from the limits' dollar amounts, and "[s]ound interpretation and application of the statute ought not depend upon a fortuitous circumstance such as the size of the respective policy limits." *Id.*

Allstate satisfied *Franklin*'s first requirement because its policy expressly and plainly prohibited stacking. But it did not preserve or accurately inform insureds of their selection right as subsection (H) requires. Rather than allowing the insured to select which coverage applies, the policy makes that determination automatically based on the vehicle involved.[2] This is exactly the defect *Lindsey* identified. *See* 897 P.2d at 633 (policy language assigning the applicable coverage based on the vehicle involved "quite literally eliminates the insured's right to select any other policy"). Like *Lindsey*, Allstate's policy replaces the insured's statutory selection with an automatic contractual rule. *See also State Farm Mut. Auto. Ins. Co. v. Balzan*, No. CV-24-0140-PR, 2026 WL 1954333, at *1–3 (Ariz. July 6, 2026) (citing *Franklin*, recognizing subsection (H) requires the insured be allowed to select the applicable policy or coverage, and quoting policy language explicitly

[2] Allstate argues the involved-auto provision does not govern UM/UIM coverage because it appears in the policy's General Provisions rather than its UM/UIM provisions. (Doc. 139 at 13–14.) But the policy expressly states that the General Provisions "apply to all parts of the policy except where otherwise noted" (Doc. 60-5 at 16), and nothing in the UM/UIM provisions notes otherwise. Allstate's invocation of the rule that a specific provision controls an inconsistent general one is therefore puzzling because it identifies no inconsistent specific policy provision.

permitting that selection).

The post-loss letters Allstate sent to some class members do not cure this policy defect. Although the letters purported to give recipients a right to select one policy or coverage, that right conflicted with the policy's automatic-assignment provision. Subsection (H) permits a timely letter when "the policy does not contain a statement that informs the insured" of the selection right. A.R.S. § 20-259.01(H). But Allstate's policy was not merely silent: it affirmatively eliminated the insured's choice by dictating exactly which coverage applied. The letters could not amend the policy by describing a selection right that the operative policy terms denied. *Franklin*, 532 P.3d at 1148 (reasoning that policy coverage cannot be unilaterally modified after execution absent mutual assent and additional consideration).

The Allstate policy's state-law conformity clause does not produce a different result. (*See* Docs. 139 at 14; 150 at 15–16.) Subsection (H) does not itself prohibit stacking or automatically insert an anti-stacking limitation into every policy. It permits an insurer to limit stacking only through policy language satisfying subsection (H)'s specified conditions. *See Lindsey*, 897 P.2d at 633–34 (holding subsection (H) is not self-executing and additional policy language is necessary to invoke its limitation). A general conformity clause cannot supply the selection right or other policy language necessary to satisfy subsection (H). At most, it would displace policy language conflicting with Arizona law; it would not transform Allstate's noncompliant limitation into a valid one.

Allstate therefore did not validly limit stacking. Its multi-vehicle policies provided separate UM/UIM coverages for each insured vehicle but eliminated the insured's right to select among them. Uniform limits plainly did not make subsection (H) inapplicable under *Lindsey*, and the post-loss letters did not cure the policy's contrary assignment provision. Dorazio's motion for partial summary judgment is granted, and Allstate's motion is denied as to the availability of stacked coverage. Dorazio and class members insured under the relevant policy language were permitted to stack UM/UIM coverages.

**2. Other Issues**

Allstate raises several additional grounds for summary judgment. First, it argues the claims of 180 class members are barred by releases they signed when accepting payment. (Doc. 139 at 15–16.) A release may be avoided when a unilateral mistake was induced by misrepresentation or when the other party knew or should have known of the mistake. *Parrish v. United Bank of Ariz.*, 790 P.2d 304, 306 (Ariz. Ct. App. 1990); *Hendricks v. Simper*, 539 P.2d 529, 533–34 (Ariz. Ct. App. 1975). Arizona regulations also require an insurer to disclose all pertinent benefits and coverages. Ariz. Admin. Code R20-6-801(D)(1). The record would permit a finding that insureds signed releases after Allstate represented only one coverage limit was available and without knowing stacked benefits might be owed. (*See* Docs. 60-4 at 22, 25, 61–64; 60-6 at 19–20.) It therefore contains factual disputes concerning the enforceability of the releases and Allstate is not entitled to summary judgment on this ground.

Allstate next seeks summary judgment against class members whose compensable losses allegedly did not exceed the amount paid, arguing Hamblin's declaration "conclusively demonstrated" that some class members have no injury. (Doc. 139 at 20–21.) This argument rests on the same analysis presented in the decertification motion, and the court rejects it for the same reasons. Hamblin's valuations rely on files Allstate stopped developing after deciding to pay the single coverage limit. That evidence creates a genuine dispute of material fact and would permit a rational factfinder to infer the class members' losses exceeded the amounts paid. *See Healy v. Milliman, Inc.*, 164 F.4th 701, 709–10 (9th Cir. 2026). Accordingly, Allstate is not entitled to summary judgment against those class members for lack of standing.

Allstate also seeks summary judgment on the bad-faith claims. The bad-faith inquiry considers "whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000).

Allstate argues its conduct was objectively reasonable because no binding authority resolved intra-policy stacking before *Franklin*. (Doc. 139 at 16–19.) That legal uncertainty is relevant, but it does not establish reasonableness as a matter of law. Even before *Franklin*, *Lindsey* and the plain language of subsection (H) could be interpreted to require stacking given Allstate's policy terms, and an insurer may be liable for bad faith if its employees "could not or did not reasonably believe that the first-party stacking claims could be rejected within the bounds of the law." *State Farm Mut. Auto. Ins. Co. v. Lee*, 13 P.3d 1169, 1175 (Ariz. 2000). Viewed in the light most favorable to Dorazio, the record permits that finding here. Allstate instructed adjusters that its policies did not permit stacking, generally did not disclose the potential availability of stacked benefits, and stopped developing claims after determining the single limit would be paid. (*See* Docs. 60-4 at 22, 25, 27; 60-6 at 21; 60-7 at 30, 33.) It nevertheless paid stacked benefits when attorneys demanded them, with internal correspondence instructing adjusters to offer only the single limit absent such a demand and acknowledging Allstate could be "forced to stack UIM coverage." (Docs. 60-4 at 57–60; 81-4 at 31, 36, 47.) A jury could accept Allstate's position that these decisions reflected reasonable management of unsettled legal exposure, but it could also instead find Allstate knew stacked coverage was potentially owed and withheld it from insureds unlikely to discover or demand it. Those competing inferences preclude summary judgment.

Finally, Allstate seeks summary judgment on punitive damages, arguing they are unavailable because the bad-faith claims fail and the record does not support the required "evil mind." (Docs. 139 at 19–20; 164 at 14.) But the bad-faith claims survive and the evidence discussed above could permit a reasonable jury to find the required evil mind—including evidence Allstate continued its claims-handling practices despite recognizing stacked coverage might be owed and paid stacked benefits when attorneys demanded them. *See Swift Transp. Co. of Ariz., L.L.C. v. Carman*, 515 P.3d 685, 692 (Ariz. 2022). Summary judgment on punitive damages is therefore also denied.

### IV. Motions to Exclude Experts

Allstate moves to exclude the expert reports and testimony of both Lance Kaufman (Doc. 140) and Steven Guy (Doc. 141). The court did not rely on either expert's opinions in resolving the pending summary-judgment or decertification motions. The court already considered Kaufman's qualifications and methodology under the limited inquiry applicable at certification and concluded his statistical analysis was useful in evaluating whether common injury was susceptible to classwide proof while declining to endorse his ultimate damages calculation. (Doc. 121 at 7–8, 18–20.) Allstate's renewed motion does not alter that standard, and the court's denial of decertification does not depend on Kaufman proving injury or damages for every class member. Likewise, the court resolves Allstate's objective-reasonableness argument on the bad-faith claims based on the governing law and record evidence without relying on Guy's opinions. The admissibility of Kaufman's final model and Guy's proposed trial testimony is therefore better resolved closer to trial. The motions to exclude are denied without prejudice to renewal in appropriate pretrial motions.

### V. Conclusion

The court's ruling establishes that Allstate did not validly limit stacking and that stacked UM/UIM coverage was available to the class. It does not determine the additional benefits owed to any particular class member, nor does it resolve any remaining factual questions concerning bad faith, punitive damages, or the enforceability of individual releases.

Accordingly,

**IT IS ORDERED** Allstate's motion to decertify (Doc. 137) is **DENIED**.

**IT IS FURTHER ORDERED** Allstate's motion for summary judgment (Doc. 139) is **DENIED**.

**IT IS FURTHER ORDERED** Dorazio's motion for partial summary judgment (Doc. 143) is **GRANTED**.

**IT IS FURTHER ORDERED** Allstate's motion to exclude Lance Kaufman (Doc. 140) is **DENIED** with leave to reinstate closer to trial.

**IT IS FURTHER ORDERED** Allstate's motion to exclude Steven Guy (Doc. 141) is **DENIED** with leave to reinstate closer to trial.

**WITHIN 21 DAYS of this order**, the parties must meet and confer and file a joint status report proposing the next steps in this action. The report must address: (1) the appropriate sequence, structure, and scope of trial on the claims surviving past summary judgment; (2) a procedure and proposed schedule for determining each class member's entitlement to additional contract benefits and the amount of any such benefits, including the evidence class members may submit and Allstate's opportunity to raise individual defenses; (3) whether a claims administrator, special master, or other individualized proceeding would assist in resolving contract damages; and (4) proposed deadlines for the remaining pretrial proceedings.

Lastly, if the parties disagree, the joint report must clearly identify their competing proposals and the reasons supporting each. The court may set a status conference after reviewing the report.

Dated this 27th day of August, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**